United States District Court
Middle District of Florida
Jacksonville Division

**TODD CRAWLEY,**

***Plaintiff,***

**v.** **NO. 3:25-cv-59-TJC-PDB**

**ALLSPRING GLOBAL INVESTMENTS, LLC,**

***Defendant.***

---

## Order

Todd Crawley sues his former employer, Allspring Global Investments, LLC, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01–760.11, alleging that Allspring terminated him in January 2024 because of his age and replaced him with a younger employee, Mel Carrozza. D1. The principal timeframe is 2023 to January 2024. Two lawyers have appeared for Crawley. Six lawyers have appeared for Allspring. Five motions to compel have been filed. D24, D27, D37, D38, D42. Those and related papers total more than one thousand pages. The court conducted a hearing on the discovery disputes on August 26, 2026. D58, D63, D64. This order memorializes and clarifies some rulings and makes additional ones.

## I. Background

### *A. 2024*

In August 2024, Allspring, through West Holden, Esquire, wrote the United States Equal Employment Opportunity Commission to detail its position on Crawley's age discrimination charge. D24-1. Allspring provided this information. Allspring is a "global asset management firm headquartered in Charlotte, North Carolina." D24-1 at 3. Crawley was a regional director responsible for managing fourteen regional directors in the eastern region. D24-1 at 3. In September 2023, Allspring hired Tony Svach as its head of intermediary sales, making Svach Crawley's direct supervisor. D24-1 at 3. In early 2024, to prepare for a reduction in force, Allspring asked Svach "to identify positions for elimination from his team." D24-1 at 4. Crawley was evaluated against his peers—a trio serving in regional director management roles—and Svach recommended Crawley. D24-1 at 3–4. According to Allspring, it "did not take Mr. Perkins' [sic] age into consideration when selecting him for termination." D24-1 at 5. Allspring provided Crawley's 2023 annual performance review, which identified Crawley, Svach, and Kris Schiller as contributors. D24-1 at 25.

### *B. 2025*

In January 2025, Crawley, through David Shankman, Esquire, filed the complaint. D1. The following month, Allspring, through Holden, answered the complaint. D7. Allspring designated Holden as its lead counsel. D8.

In March 2025, the parties, through Shankman and Holden, conferred about case management. *See* D13 ¶1. The parties agreed to "the timing, form,

or requirement for disclosures under Rule 26(a)[.]" D13 ¶9(A). The parties anticipated that ESI discovery would be required but were unaware of any ESI issues at the time. D13 at 5. The parties checked "No" to any stipulation regarding "changes to the limitations on discovery imposed under the Federal Rules of Civil Procedure and Local Rule 3.04 or other limitations[.]" D13 ¶9(F). The parties requested no special handling. D13 ¶10.

In April 2025, the court entered a case management and scheduling order, setting an April 2025 deadline for mandatory initial disclosures and a January 2026 deadline to complete discovery, and ordered the parties to request discovery so that it would be due before the deadline and to file any motion to compel by the deadline. D14 at 1–2, ¶1. The court warned the parties, "**THE COURT HAS DONE EVERYTHING POSSIBLE TO SET APPROPRIATE DEADLINES FOR THIS CASE. THE PARTIES SHOULD PROCEED ACCORDINGLY. DO NOT ASSUME THAT THE COURT WILL EXTEND THESE DEADLINES**." D14 ¶10.

On the April 2025 deadline, Allspring, through Mikayla Almeida, Esquire, served its mandatory initial disclosures. D47-2. Allspring identified only three people it believed might have discoverable information that Allspring might use to support its defenses: Crawley, Svach, and Courtney Leonard. D47-2 at 2–3. Allspring explained that Svach and Leonard are "believed to have knowledge" about the allegations and defenses, including Crawley's employment and termination. D47-2 at 3.

Also in April 2025, the parties exchanged discovery requests. Crawley served a request for production (thirty-two). D29-2. Allspring, through Almeida, served a set of interrogatories (sixteen), D27-1, and a request for production (fifty-eight), D27-2. Allspring designated Nancy Johnson, Esquire,

as its new lead counsel, with Holden and Almeida also appearing on the signature block. D15 at 2.

In July 2025, Crawley responded to Allspring's discovery requests, D27-3, D27-4, and served his mandatory initial disclosures, D38-1. Around the same time, Almeida took maternity leave, D26 ¶8, and Allspring, through Johnson, responded to Crawley's requests for production, D29-3. The response included a three-page "preliminary statement," two pages of objections to Crawley's instructions and definitions, and objections and counsel-imposed limitations, like this one:

> **REQUEST FOR PRODUCTION NO. 12**: Produce all documents, correspondence, statements, notes, audio and/or video recordings concerning the decision to terminate Plaintiff.
>
> **RESPONSE**: Defendant objects to this Request on the grounds that it is vague and ambiguous, as the term "statements" and phrase "concerning" are not defined, limited, or explained by Plaintiff in any way. As such, this Request fails to "describe with reasonable particularity each item or category of items to be inspected" as required by the Federal Rules of Civil Procedure 34(b)(1)(A). Defendant further objects to this Request on the grounds it is overbroad in substantive scope insofar as it seeks all documents (a term expansively defined by Plaintiff to include writings, photographs, video recordings), correspondence (a term expansively defined by Plaintiff to include "any communication regardless of the method[sic] or format"), "statements, notes, audio and/or video recordings" from November 1, 2021 through March 4, 2024 "concerning the decision to terminate Plaintiff," which necessarily includes documents that do not relate to a claim or defense asserted in this Action, are not at issue in this litigation and are, therefore, irrelevant. For example, this Request would include any email sent by an Allspring employee "concerning the decision to terminate Plaintiff[,]" regardless of whether that employee made the decision to terminate Plaintiff's employment.

> To respond to this Request as written, Defendant would need to conduct a company-wide search of all documents, correspondences, statements, notes, audio and video recordings from November 1, 2021 to March 4, 2024, regardless of their relevancy or materiality to the case to identify whether they "concern[] the decision to terminate Plaintiff." The undue burden and expense associated with the collection, review, and production of these documents would be unduly burdensome, oppressive, harassing, and is not proportional to the needs of the case. Moreover, Defendant objects to this Request to the extent it seeks documents protected from disclosure by the attorney client privilege and/or work product doctrine.
>
> **Limiting its response to** the non-objectionable portion of this Request seeking non privleged [sic] **documents and emails sent by Tony Svach** regarding the decision to terminate Plaintiff's employment, Defendant has conducted a reasonable search and diligent inquiry for relevant, proportional responsive documents and will produce responsive documents, if any, on a rolling basis starting within ten (10) business days from the entry of a mutually agreeable confidentiality agreement.

D29-3 at 13–14 (emphasis added). In addition to objecting to the absence of definitions for "statements" and "concerning," Allspring objected to the absence of definitions for "report," "reports," "Tableau Dashboard," "Portfolio Manager/Specialist engagement report," "performance improvement plans," "reporting," "system," "sales goals," "calendar," "counseling," "coaching," "discipline," "Monthly Retail Intermediate Distribution Update/Report," "reviews," "relating to," "addresses any," "qualified," "evaluating," "all documents," "cases closed," "evaluate," "performance evaluations," "performance evaluation software," "comment upon," "personnel file," "Engroff," "Carrozza," "coach, counsel, [and] discipline," "evidence," "rating," "ranking," and "travel." D29-3 at 5–24. Allspring produced some documents without labeling any document to correspond to any request. D24 at 3.

At the end of July 2025, the parties moved to extend the deadlines by 90 days, D16 ¶¶12–13, because Allspring was delayed in hiring an e-discovery vendor to obtain ESI, D16 ¶5, and Shankman had trials scheduled for September 2025, November 2025, and January 2026, D16 ¶11. Allspring explained that, to respond to Crawley's discovery requests, it had to review fourteen GBs of ESI—"hundreds of thousands of pages"—consisting primarily of emails. D16 at ¶6. Allspring said that it would provide documents on a "rolling" basis beginning at the end of July 2025. D16 ¶9. Allspring explained, "Although the Parties understood ESI discovery would be required for this case at the time they submitted the Case Management Report, ... they did not anticipate the ESI discovery would be so extensive. The Parties also could not foresee Defendant would encounter unexpected delays in securing an approved e-Discovery vendor or that a rolling production would be required." D16 ¶10. The court granted the motion and extended the discovery deadline to the end of April 2026. D17, D18.

In September 2025, Allspring produced more documents. D24 at 4. As before, the documents were not labeled to correspond to any request. D24 at 4. More than once, Shankman asked Johnson and Holden to remedy deficiencies in Allspring's discovery response, and more than once, they ignored him. D24 at 4–5.

In October 2025, Allspring produced a document, prepared at counsel's direction, that identified John Moninger as the "[h]ighest level decision maker" for the "Job Elimination, Consolidation, or Skill Set Change":

Allspring PREPARED AT THE DIRECTION OF COUNSEL

Allspring Global Investments Business Case for Job Elimination, Consolidation, or Skill Set Change

| | |
|---|---|
| Business (Decisional) Unit: US Distribution | Legal Entity: Allspring Global Investment Holdings LLC |
| Highest level decision maker: John Moninger | HR Partner: Courtney Leonard |
| Notification date: January 22, 2024 | Budget Code: |

D24-6 at 2; D47 at 3 n.2.

On December 30, 2025, Almeida's mother passed away.[1] D26 ¶8. Around the same time, Shankman's brother-in-law passed away. D26 ¶8.

### *C. 2026*

In January 2026, Crawley sent Allspring a draft motion to compel regarding Allspring's responses to Crawley's requests for production. D47 at 3

[1]At the August 26, 2026, hearing, D58, D63, D64, Ryan Forrest, Esquire, was unprepared to answer questions about the objections that Allspring had made to Crawley's requests for production. D64 at 74–76, 78–79. The court directed him to call Almeida, who had signed the latest responses, and ask her why she had continued to make certain objections and impose certain limitations. *Id.* After a recess, Forrest told the court, "When we were talking about response to Request for Production No. 12, I have some background for that information. The resolution, the front end of that, is that I was not able to make contact with my colleague. It is, I've come to learn, the one-year anniversary of the date of her mother's death, and so she is out of the office today." *Id.* at 80. Thus, counsel has represented to the court both that Almeida's mother passed away on December 30, 2025 (to obtain an extension of the deadlines) and that Almeida was out of the office on August 26, 2026, because of the one-year anniversary of her mother's death (to explain why Forrest could provide the court with no answer to its questions).

n.3. Later that month, Shankman and Holden conferred about the discovery dispute. D24 at 5–6.

In February 2026, Allspring, through Holden, twice amended its response to Crawley's requests for production to add documents and to identify, by Bates number, which documents respond to which request. D29-4, D29-5. Allspring otherwise maintained its objections. D24 at 6. During the same month, Almeida returned. D26 ¶8.

In March 2026, Johnson moved to withdraw as Allspring's counsel, explaining that she "is no longer associated with this case," D19 ¶1, and that her withdrawal will prejudice no one because Allspring "is still represented" by Philip Marchion, Esquire, D19 ¶4. Holden also moved to withdraw as Allspring's counsel, explaining that he was leaving the law firm retained by Allspring. D23 ¶2. The court granted the motions. D20, D25. Allspring designated Marchion as its new lead counsel. D21.

On March 20, 2026, Ryan Forrest, Esquire, entered an appearance for Allspring. D22. On the same day, he wrote a 20-page, single-spaced letter to Shankman in an asserted attempt to confer about claimed deficiencies in discovery that Crawley had provided the previous July. D27-6; *see* D27-3, D27-4. Forrest said that the parties had to resolve the "deficiencies" within a week. D27-6 at 1.

Also on March 20, 2026, Almeida and Forrest each emailed Shankman, D27-5 at 7–10, and, between March 23 and 26, the lawyers exchanged emails to discuss discovery and other matters, D27-5 at 1–7. Shankman informed them that he would be moving to compel that week. D27-5 at 6. Forrest asked what the motion was about and stated, "As far as we're concerned you haven't

conferred with us meaningfully yet. … Do you have a conferral letter you could send me?" D27-5 at 5. Shankman informed Forrest that he and Holden had discussed the dispute and that Forrest should talk to Holden.[2] D27-5 at 5.

On March 26, 2026, Crawley filed his first motion to compel. D24, D24-1 to D24-6. Crawley asks the court to strike Allspring's objections to Crawley's requests for production and compel Allspring to produce the requested documents. D24. Crawley's counsel includes a certification: "[U]ndersigned counsel certifies that he has conferred in good faith with defense counsel regarding this matter, but the issues addressed herein could not be resolved, necessitating this Motion." D24 at 1. Crawley argues that Allspring fails to organize and label produced documents, raises "boilerplate" objections, frivolously complains that ordinary words are undefined, and fails to confirm which documents it is withholding. D24 at 14–15. Allspring disagrees and moves for fees incurred in responding to the motion, arguing that Crawley failed to confer before filing the motion, makes confusing arguments, and fails to analyze Allspring's objections in their full context. D29.

---

[2]The professional relationship between Shankman and Forrest got off to a rocky start, a harbinger of things to come. In a March 23, 2026, email, Forrest wrote, "I understand that you made contact with [Holden] today. Can you please let me know when you have availability for a conferral call this week?" D27-5 at 7. To Shankman's response that he could not meet that week because he was in California for depositions but could meet the following week, Forrest replied, "[Y]ou must have some time this week to confer? You don't have an hour? … [Y]ou have time to prepare and file a motion, but not to confer?" D27-5 at 6. Shankman replied, "I enjoyed the tone of your email. Always nice to know what I'm dealing with from the outset." D27-5 at 5.

On March 27 and 31, 2026, Shankman and Forrest met by videoconference to confer about a motion to compel that Allspring planned to file. D27 at 17; D38-3.

In April 2026, the parties moved to extend the deadlines by another 90 days. D26. They offered seven reasons. First, Almeida's maternity leave and her mother's death resulted in her taking six months' leave. D26 ¶8. Second, Shankman's loss of his brother-in-law diverted his attention from the discovery disputes. D26 ¶8. Third, Allspring's new counsel needed time to "get up to speed." D26 ¶9. Fourth, additional time would allow the court to decide Crawley's pending motion to compel, D24, and Allspring's anticipated motion to compel. D26 ¶11. Fifth, additional time would allow Allspring to obtain non-party records, enabling the parties to conduct depositions on a "full record." D26 ¶11. Sixth, additional time would enable the parties to "engage in a full deposition schedule" and to coordinate around a May 2026 arbitration on Forrest's calendar. D26 ¶12. Seventh, additional time would increase the likelihood of success at mediation by allowing the parties to "complete meaningful additional discovery[.]" D26 ¶13. The parties represented that they "do not anticipate any further continuances." D26 ¶15. The court granted the motion and extended the deadlines. D28, D30.

Also in April 2026, Allspring filed its anticipated motion to compel. D27, D27-1 to D27-8. Allspring asks the court to compel Crawley to provide better answers to three interrogatories and better responses to three requests for production. D27. The day before the August 26, 2026, hearing, Allspring informed the court that the parties had resolved some of the dispute. D62. Allspring still wanted Crawley to provide a better answer to an interrogatory asking him to identify every source of income and benefits he has received since

March 2023; a better response to a request for production asking him to produce his complete tax returns from 2022 to the present; and a better response to a request for production asking him to provide a completed tax information authorization form. D27. Crawley agreed to provide any records of income he has earned through employment or consulting, but not, as assertedly irrelevant, of his wife's income and any income he has earned through passive investments. D31.

In mid-May 2026, Allspring filed an unprompted "notice," contending that Crawley continued to refuse to confer on his first motion to compel, D24. D34. According to Allspring, the notice provides "further" reason to support a fee sanction against Crawley. D34 at 5. Allspring includes 78 pages of mostly email communications between the lawyers. D34-1 to D34-5. Crawley responds that he should not "be required to explain in detail why every document requested is relevant, when relevancy in this context is clear on its face and [Allspring] has not provided a basis to state otherwise." *See* D35 at 7 (quoted). Crawley asks the court to strike the notice. D35 at 7.

On June 2, 2026, Crawley deposed Svach, but Shankman ended the deposition after approximately an hour because Svach testified that he kept notes of his meetings and conversations with Crawley in OneNote, but that no one had asked him to provide the notes. D45-5 at 24–25. The deposition devolved into an unpleasant exchange between the lawyers, with Shankman wanting to proceed with the deposition if Svach could confirm that no notes exist, or to pause the deposition if Svach confirmed that notes exist, to allow Shankman to obtain them, review them, and tailor his questions accordingly; and with Almeida and Forrest taking a double-team approach, refusing to let Svach determine whether notes existed and insisting that Shankman complete

the deposition except as to any question about any undisclosed notes. D45-5 at 29–42. Before the deposition ended, Svach testified that Moninger had hired him; that Moninger had been his supervisor when he started and remains his supervisor; that Moninger had told him about concerns regarding larger territories overseen by regional directors Brian Bock and Chad Brand and had instructed him to assess whether sales in those regions aligned with the market opportunities in those regions; and that he had talked extensively to Crawley about Moninger's concerns. D45-5 at 9–10, 15, 18.

Also in June 2026, the parties conferred about the notes and the continuance of Svach's deposition. D45-6. Forrest informed Shankman that he had completed a review of Svach's notes and found six responsive documents. D45-6. He agreed to produce Svach for a second deposition, but limited only to questions about the six documents. D45-6 at 1.

Also in June 2026, Allspring amended its mandatory initial disclosures to add Moninger as someone who "may have discoverable information [Allspring] may use to support its claims or defenses[.]" D37-1 at 3–4. Allspring explained, "Mr. Moninger is believed to have knowledge regarding [Crawley]'s allegations and [Allspring]'s defenses, as well as matters relating to [Crawley]'s employment, including the circumstances surrounding [Crawley]'s termination." D37-1 at 4. According to Almeida, Allspring's initial disclosures, which had been due and provided more than a year earlier, in April 2025, D14 at 1; D47-2; "inadvertently omitted Moninger." D47 at 3 n.2.

Around the same time, Crawley filed his second motion to compel. D37, D37-1 to D37-3. He makes eight requests. D37. First, he moves for permission to resume Svach's deposition. D37 at 10–15. Second, he moves for permission to depose, in excess of the ten-deposition limit, all regional managers, in

addition to Moninger and Allegra Heyligers (a woman who worked in the corporate office on "the layoff side of the … analysis in this case[,]" *see* D64 at 14 (quoted)). D37 at 16–19. Third, he moves to strike Moninger as a witness because of Allspring's late disclosure of him. D37 at 19–21. (He mentions Allspring's failure to disclose Heyligers in a heading, but argues only about Allspring's belated disclosure of Moninger. *See* D37 at 19–21.) Fourth, he again moves to strike Allspring's objections to his requests for production, D24-2. D37 at 21–23. Fifth, he again moves to compel production of the documents requested in his requests for production, D24. D37 at 21–23. Sixth, he moves to appoint a special master to ensure that Allspring complies with its discovery obligations. D37 at 21–23. Seventh, he moves for an order requiring Allspring to identify which documents are responsive to which requests for production, and to do so for all future discovery. D37 at 24. Eighth, he moves for a fee sanction. D37 at 24. Shankman provides this certification: "Undersigned counsel certifies that he conferred with opposing counsel regarding the issues raised in this motion in person on June 2, 2026, and in subsequent emails and video calls but the dispute could not be resolved." D37 at 24; *see also* D45-5 (Svach's deposition on June 2, 2026).

Allspring argues that Crawley failed to confer before filing the motion; lacks a basis to depose Svach a second time, to exceed the ten-deposition limit, and to appoint a special master; attempts to re-argue his first motion to compel, D24, in violation of Local Rule 3.01(h)'s prohibition on incorporating by reference another paper; and fails to show that sanctions are otherwise warranted. D47 at 4–14, 16–18. Allspring argues that it was not required to amend its initial disclosures to add Moninger, the discovery produced in October 2025 identified Moninger as a decision-maker, and Crawley is deposing Moninger as a corporate representative and in his individual

capacity. D47 at 14–16. Allspring argues that the request for labeling is moot because Allspring amended its responses to identify which documents are responsive to which requests. D47 at 18–19. Allspring requests a fee sanction, D47 at 19–20, and moves to strike Crawley's response to Allspring's notice, D35, because the court never permitted a response, D47 at 16 n.13.

On the same day that Crawley filed his second motion to compel, D37, Allspring filed its second motion to compel, D38, and a week later, a third motion to compel, D42. Allspring later withdrew the motions. D51, D62.

In July 2026, Crawley moved to stay further depositions and suspend all discovery pending a hearing and resolution on the outstanding disputes. D40. Allspring argued that a stay would be unduly prejudicial by preventing Allspring from deposing Crawley later in July and forcing it to incur non-refundable costs for the deposition, by preventing Allspring from gathering discovery relevant for mediation, and by "otherwise delaying Allspring from having its day in court." *See* D45 at 2 (quoted). The court denied the motion. D46.

In late July 2026, Crawley deposed Moninger as a corporate representative and a fact witness. D64 at 14. Besides him, Crawley has deposed Svach, D45-5; Carrozza, D47 at 4; Leonard, D45-5, D47-1; Heyligers, D64 at 14; Scott Engroff, D47 at 4; and three regional directors (Chris Boeker, David Mamone, and Matt Hogfeldt), D64 at 15–16. Allspring has deposed only Crawley. D45-1; D64 at 16.

The discovery period ended on July 29, 2026. D30 at 1.

In early August 2026, the parties attended mediation and reached an impasse. D57. Tanja Darrow, Esquire, moved to appear pro hac vice to represent Allspring in this action, D60, and the court granted the motion, D61. The August 26, 2026, hearing, D58, D63, D64, and a joint motion for a post-hearing status conference, D65, followed.

## II. Law

### *A. General Laws and Guidance*

To practice in this court, a lawyer must take an oath,[3] acknowledge that he is familiar with 28 U.S.C. § 1927, confirm that he will comply with the federal and local rules, and remain familiar with, and bound by, the rules governing the professional conduct of a member of The Florida Bar. Local Rule 2.01(b)(1)(C)–(E), 2.01(e).

Section 1927 provides, "Any attorney or other person admitted to conduct cases in any court of the United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

The federal rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive

[3]The oath states, "The undersigned hereby affirms, that he/she will support the constitution of the United States, that he/she will bear true faith and allegiance to the government of the United States, that he/she will maintain the respect due to the Courts of Justice and all Judicial Officers, that he/she will well and faithfully discharge his/her duties as an attorney and officer of this court, and that he/she will conduct himself/herself uprightly and according to the law of the recognized standards of ethics of the legal profession, so help you God."

determination of every action and proceeding." Fed. R. Civ. P. 1. The local rules "advance efficiency, consistency, convenience, and other interests of justice." Local Rule 1.01(a).

"Discovery in this district should be practiced with a spirit of cooperation and civility." Middle District Discovery (2021) at Section I.A.1. Indeed, "[t]he district's attorneys and the [c]ourt are justifiably proud of the courteous practice that is traditional in the Middle District." *Id.*

In keeping with the rules and guidance, "A party should tailor discovery requests to the needs of each case." *Id.* at Section I.C.3. "The content of the requests should apply to the particular case, and the form of discovery requested should be the one best suited to obtain the information sought." *Id.* "In each case a party should carefully determine which discovery methods will achieve the discovery goal of obtaining useful information as efficiently and inexpensively as possible for everyone concerned." *Id.* "A party responding to a discovery request should make diligent effort to provide a response that … fairly meets and complies with the discovery request and … imposes no unnecessary burden or expense on the requesting party." *Id.* at Section I.C.4.

### *B. Case Management*

Under Rule 26(f), at a conference to plan for discovery, the parties have these responsibilities:

> In conferring, the parties must consider the nature and basis of their claims and defenses and the possibilities for promptly settling or resolving the case; make or arrange for the disclosures required by Rule 26(a)(1); discuss any issues about preserving discoverable information; and develop a proposed discovery plan. The attorneys of record … that have appeared in the case are jointly responsible

> for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan. ....

Fed. R. Civ. P. 26(f)(2).

The parties' resulting discovery plan must state the parties' views and proposals on these subjects:

> (A) what changes should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement of when initial disclosures were made or will be made;
>
> (B) the subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused on particular issues;
>
> (C) any issues about disclosure, discovery, or preservation of [ESI], including the form or forms in which it should be produced;
>
> (D) any issues about claims of privilege or of protection as trial-preparation materials, including the timing and method for complying with Rule 26(b)(5)(A) and—if the parties agree on a procedure to assert these claims after production—whether to ask the court to include their agreement in an order under Federal Rule of Evidence 502;
>
> (E) what changes should be made in the limitations on discovery imposed under these rules or by local rule, and what other limitations should be imposed; and
>
> (F) any other orders that the court should issue under Rule 26(c) or under Rule 16(b) and (c).

Fed. R. Civ. P. 16(f)(3); *see also* Local Rule 3.02(a).

Counsel should, during their conference, discuss the following topics, with encouragement to include their client's information technology experts in the discussion:

> 1. The locations and sources where relevant ESI is likely to be found. This includes the identity of people likely to have relevant ESI.
>
> 2. Reasonable steps to preserve ESI.
>
> 3. The relevant time period.
>
> 4. The manner and forms of preservation and production including the production of ESI maintained in a database. Possible forms for the production of ESI include native, TIFF, and PDF. Absent agreement or a Court order, Rule 34(b) provides that ESI should be produced in either the form in which it is "ordinarily maintained" or in a "reasonably useable" form. When deciding what format(s) to use counsel, with the assistance of their information technology experts, are encouraged to discuss:
>
> > (a) The form or forms of ESI that will be most likely to provide the information needed to establish the relevant facts in the case.
> >
> > (b) The need for metadata.
> >
> > (c) Accessibility of ESI in the form requested.
> >
> > (d) The requesting party's ability to manage and use ESI in the form requested.
> >
> > (e) Risks associated with the inadvertent production of privileged or confidential information associated with the different forms of production.
> >
> > (f) The difficulty of redacting ESI in the form requested.

> (g) The extent to which alternative forms of production will satisfy a party's needs.
>
> (h) The types of metadata that will be preserved and produced.
>
> (i) Sources of ESI that are not reasonably accessible.
>
> (j) The relative costs and other burdens associated with collecting, processing, reviewing, and producing ESI.
>
> (k) Allocation of the costs of production.
>
> (l) The use of search terms, sampling, de-duplication, "quick-peeks," technology assisted review methods including, for example, predictive coding and other strategies to reduce the volume of ESI that must be preserved and produced.
>
> (m) How to deal with issues of confidentiality and privilege including the use of "claw-back agreements" or the appointment of a special master to resolve disagreements.
>
> (n) Tiered discovery in which ESI is produced sequentially in tranches.
>
> (o) Disposal of ESI at the appropriate time.

Middle District Discovery at Section VIII.D.

After receiving the parties' report, the court must enter a scheduling order that includes deadlines "to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(1) & (3)(A).

The "schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the

party seeking the extension." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (internal quotation marks and quoted authority omitted). "If a party was not diligent, the good cause inquiry should end." *Id.* (alterations and quoted authority omitted).

The court "follows the rule that the completion date [for discovery] means that all discovery must be completed by that date." Middle District Discovery at Section I.F. "For example, interrogatories must be served more than thirty days prior to the completion date to permit the opposing party to respond before the discovery deadline." *Id.* "Untimely discovery requests are subject to objection on that basis." *Id.* "Counsel, by agreement, may conduct discovery after the formal completion date but should not expect the [c]ourt to resolve discovery disputes arising after the discovery completion date." *Id.*

"On motion or on its own, the court may issue any just orders … if a party or its attorney … fails to appear at a scheduling or other pretrial conference; … is substantially unprepared to participate—or does not participate in good faith—in the conference; or … fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(A)–(C). "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2).

### *C. Mandatory Initial Disclosures*

Rule 26(a)(1) mandates that a party, without awaiting a discovery request, provide the opposing party "the name and, if known, the address and

telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]" Fed. R. Civ. P. 26(a)(1)(A)(i).

Rule 26(a)(1) also mandates timing: "A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan." Fed. R. Civ. P. 26(a)(1)(C).

Rule 26(a)(1) also mandates that a party make its mandatory initial disclosures based on the information "then reasonably available to it" and warns that "[a] party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." Fed. R. Civ. P. 26(a)(1)(E).

Rule 26(e)(1) requires timely supplementation or correction of the mandatory initial disclosures and other discovery: "A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response … in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or … as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A)–(B); *see also* Middle District Discovery at Section I.D ("Rule 26(e) … expressly provides that in many instances a party

is under a duty to supplement or correct prior disclosures …. Fairness and professionalism suggest a broader range of circumstances requiring supplementation.”).

Counsel is responsible for complying with the mandatory disclosure requirements. Middle District Discovery at Section I.B. “If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.” Fed. R. Civ. P. 37(c)(1). “In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard[,] … may order payment of the reasonable expenses, including attorney’s fees, caused by the failure; … may inform the jury of the party’s failure; and … may impose other appropriate sanctions[.]” Fed. R. Civ. P. 37(c)(1)(A)–(C).

A lawyer or unrepresented party must sign every mandatory initial disclosure and every discovery request, response, or objection; and provides that, through the signature, the signer makes this certification:

> [The signer] certifies that to the best of the person’s knowledge, information, and belief formed after a reasonable inquiry:
>
> (A) with respect to a disclosure, it is complete and correct as of the time it is made; and
>
> (B) with respect to a discovery request, response, or objection, it is:
>
> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending,

> modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and
>
> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

Fed. R. Civ. P. 26(g)(1)(A)–(B). "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3). "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." *Id.*

### *D. Scope of Discovery*

Rule 26(b)(1) states the scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*

Under Rule 26(b)(2), "On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed … if it determines that … the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; … the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or … the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i)–(iii).

### *E. Depositions*

A party generally "may, by oral questions, depose any person, including a party, without leave of court." Fed. R. Civ. P. 30(a)(1). But a party must "obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2) … if the parties have not stipulated to [a] deposition and … the deposition would result in more than [ten] depositions being taken under this rule … by the plaintiffs, or by the defendants[,] … [or] the deponent has already been deposed in the case[.]" Fed. R. Civ. P. 30(a)(2)(A)(i)–(ii). The court, however, "may alter the limits … on the number of depositions[.]" Fed. R. Civ. P. 26(b)(2)(A).

"An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection." Fed. R. Civ. P. 30(c)(2). "An objection must be stated concisely in a nonargumentative and nonsuggestive manner." *Id.* "The court may impose an appropriate sanction—including the reasonable expenses and attorney's

fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2).

"At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A). "If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order." *Id.* "The court may order that the deposition be terminated or may limit its scope and manner[.]" *Id.* "If terminated, the deposition may be resumed only by order of the court where the action is pending." Fed. R. Civ. P. 30(d)(3)(B). "Rule 37(a)(5) applies to the award of expenses." Fed. R. Civ. P. 30(d)(3)(C).

"While more than one attorney for each party may attend [a deposition], only one should question the witness or make objections, absent an agreement to the contrary." Middle District Discovery at Section II.A.2. "Those in attendance should conduct themselves in the manner expected during courtroom proceedings in the presence of a judge." *Id.* "Conduct during depositions should accord with Local Rules 5.03(c)(5) [counsel should state only the legal basis for an objection], (8) [counsel should refrain from any display of animosity toward anyone in the room, including a lawyer, litigant, or witness], and (9) [counsel should refer to a person by the person's title and surname (for example, Ms. Smith or Dr. Robinson) or case designation (for example, 'the plaintiff,' 'the defendant,' or 'the witness')], and (d)(2) [counsel must limit examination or cross-examination of a witness to one lawyer for each party and ensure the lawyer who objects during direct examination of a witness is the same lawyer who cross-examines the witness.][.]" *Id.* "In unusual

circumstances with material and adverse consequences," parties may telephone the assigned magistrate judge's chambers to resolve "an intractable dispute that has arisen during the deposition." *Id.* at Section II.B.5.

"If requested documents that are discoverable are not timely produced prior to [a] deposition, the party noticing the deposition may either adjourn the deposition until after such documents are produced or, without waiving the right to have access to the documents and to subsequently examine the deponent regarding the documents, proceed with the deposition." *Id.* at Section II.C.2.

### *F. Requests for Production*

A party may "serve on any other party a request within the scope of Rule 26(b) … to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control": "any designated documents or [ESI] … stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form"; or "any designated tangible things[.]" Fed. R. Civ. P. 34(a)(1)(A)–(B).

To make a request for production, a party "must describe with reasonable particularity each item or category of items to be inspected; … must specify a reasonable time, place, and manner for the inspection and for performing the related acts; and … may specify the form or forms in which [ESI] is to be produced." Fed. R. Civ. P. 34(b)(1)(A)–(C). The request "should be clear, concise, and reasonably particularized." Middle District Discovery at Section III.A.1. "For example, a request for 'each and every document supporting your

claim' or a request for 'the documents you believe support Count I' is objectionably broad in most cases." *Id.*

"The party to whom the request is directed must respond in writing within 30 days after being served[.]" Fed. R. Civ. P. 34(b)(2)(A). "A shorter or longer time may be stipulated to … or be ordered by the court." *Id.* "For each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). "The responding party may state that it will produce copies of documents or of [ESI] instead of permitting inspection." *Id.* "The production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response." *Id.*

"An attorney receiving a request for documents or a subpoena duces tecum shall reasonably and naturally interpret it, recognizing that the attorney serving it generally does not have specific knowledge of the documents sought and that the attorney receiving the request or subpoena generally has or can obtain pertinent knowledge from the client." Middle District Discovery at Section III.A.3. "Words used in discovery normally should carry their plain and ordinary meaning unless the particular case requires a special or technical definition, which should be specified plainly and concisely by the party required to respond to the term(s)." *Id.* at Section III.A.2. "[E]vasive or incomplete disclosures, answers, or responses may be sanctionable[.]" *Id.* at Section III.A.3.

"An objection must state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C). Furthermore, "[a]n objection to part of a request must specify the part and

permit inspection of the rest." *Id.* "Attorneys should not make objections solely to avoid producing documents that are relevant to any party's claim or defense and proportional to the needs of the case." Middle District Discovery at Section III.A.6. "Objections to portions of a document request do not excuse the responding party from producing those documents to which there is no objection." *Id.* "Specific objections should be matched to specific requests." *Id.* "Boilerplate objections such as 'the request is overly broad, unduly burdensome, and outside the scope of permissible discovery' are insufficient without a full, fair explanation particular to the facts of the case." *Id.* "When the scope of the document production is narrowed by one or more objections, this fact and the nature of the documents withheld should be asserted explicitly for that request." *Id.* at Section III.A.7.

"If a party objects to a request as overbroad when a narrower version of the request would not be objectionable, the documents responsive to the narrower version ordinarily should be produced without waiting for a resolution of the dispute over the scope of the request." *Id.* at Section III.A.8. "When production is limited by a party's objection, the producing party should clearly describe the limitation in its response." *Id.*

"Upon receiving a document request, counsel should promptly confer with the client and take reasonable steps to ensure that the client: (a) understands what documents are requested, (b) has adopted a reasonable plan to obtain documents in a timely and reasonable manner, and (c) is purposefully implementing that plan in good faith." *Id.* at Section III.A.4.

When producing documents or ESI, "[a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request[.]" Fed. R. Civ. P.

34(b)(2)(E)(i). "If a request does not specify a form for producing [ESI], a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Fed. R. Civ. P. 34(b)(2)(E)(ii). "A party need not produce the same [ESI] in more than one form." Fed. R. Civ. P. 34(b)(E)(iii). "The producing party is encouraged to list or mark the documents which have been produced with unique Bates labels, hash values, control numbers, or another document identification convention." Middle District Discovery at Section III.B.5.

"A party and counsel ordinarily have complied with the duty to respond to a document request if they have" taken these actions: "[r]esponded to the requests within the time set by the governing rule, stipulation, or court-ordered extension"; "[o]bjected with specificity to objectionable requests and included reasons"; "[s]tated whether any responsive materials are being withheld on the basis of an objection"; "[p]roduced the documents themselves (or copies), specifically identified those documents that are being or will be produced, or specified precisely where the documents can be found and when they can be reviewed"; "state[d] a specific date when the responsive documents will be available" (not, for example, an ambiguous "mutually agreeable time"); "[s]tated specifically that no responsive documents have been found"; and "[e]nsured a reasonable inquiry with those persons and a reasonable search of those places likely to result in the discovery of responsive documents." *Id.* at Section III.A.5.

"The [c]ourt expects attorneys to reach agreements regarding the production of documents based upon considerations of reasonableness, convenience, and common sense." *Id.* at Section III.B.1.

## G. *Motions to Compel*

"On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). "[I]f a [c]ourt order is obtained compelling discovery, unexcused failure to comply with such an order is treated by the Court with special gravity and disfavor." Middle District Discovery at Section I.E.3.

A motion to compel must "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1); *see also* Middle District Discovery at Section VIII.F ("The parties should resolve discovery disputes through the meet and confer process or, if such negotiations are unsuccessful, resort to motion practice. Counsel should consult Rule 26(b)(1) on proportionality and this handbook for relevant factors to discuss when they confer.").

The local rules require a similar certification for nearly all motions: "Before filing a motion in a civil action, except a motion for a Rule 11 sanction, for injunctive relief, for judgment on the pleadings, for summary judgment, or to certify a class, the movant must confer with the opposing party in a good faith effort to resolve the motion." Local Rule 3.01(g). The term "confer" "means a substantive discussion." Middle District Discovery at Section I.A.2. "Counsel must respond promptly to inquiries and communication from opposing counsel." *Id.* "Many potential discovery disputes are resolved (or the differences narrowed or clarified) when counsel confer in good faith." *Id.* The conferral rule "is strictly enforced." *Id.* "A motion that does not comply with the rule may be summarily denied." *Id.*

"Correspondence exchanged during the course of litigation … between opposing counsel … should be filed with the [c]ourt only to comply with an order of the [c]ourt or when necessary to the presentation and consideration of a motion and only when the filing of traditional discovery material will clearly not suffice for the purpose." *Id.* at Section I.C.1. "Counsel should carefully redact correspondence to exclude irrelevant and prejudicial material[.]" *Id.*

"If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A); *accord* Middle District Discovery at Section I.E.3 ("If a party must seek relief from the [c]ourt to compel a recalcitrant party to respond, the moving party may be awarded reasonable expenses including attorney's fees incurred in compelling the responses. [The rule] is enforced in this district."). "But the court must not order this payment if: … the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; … the opposing party's nondisclosure, response, or objection was substantially justified; or … other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(i)–(iii).

If a motion is denied, "the court may issue any protective order … and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). "But the court must not order this payment if

the motion was substantially justified or other circumstances make an award of expenses unjust." *Id.*

If the motion is granted in part and denied in part, "the court may issue any protective order … and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C).

### *H. Special Masters*

Unless prohibited by statute, a court may appoint a special master to "address pretrial … matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). "In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). A master may "regulate all proceedings; … take all appropriate measures to perform the assigned duties fairly and efficiently; and … if conducting an evidentiary hearing, exercise the appointing court's power to compel, take, and record evidence." Fed. R. Civ. P. 53(c)(1)(A)–(C). "The master may by order impose on a party any noncontempt sanction … and may recommend a contempt sanction against a party and sanctions against a nonparty." Fed. R. Civ. P. 53(c)(2).

### *I. Punitive Damages*

Punitive damages are not recoverable under the ADEA. *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1446 (11th Cir. 1985). They are recoverable under the FCRA, up to $100,000. *See* Fla. Stat. § 760.11(5).

"Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct

and to deter similar misconduct by it and other actors in the future." *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1216 (11th Cir. 2010) (quoting *Owens–Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999)). "The Supreme Court of Florida, therefore, has determined that the wealth of the defendant is a factor for consideration in determining the reasonableness of a punitive award: 'an award must be reviewed to ensure that it bears some relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy of the defendant.'" *Myers*, 592 F.3d at 1216 (quoting *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1263–64 (Fla. 2006)). "While it is not 'an accurate rule of law that the greater a defendant's wealth, the greater must be punitive damages,' *Bankers Multiple Line Ins. Co. v. Farish*, 464 So. 2d 530, 533 (Fla. 1985), a 'jury may properly punish each wrongdoer by exacting from his pocketbook a sum of money which, according to his financial ability, will hurt, but not bankrupt.' *Bould v. Touchette*, 349 So. 2d 1181, 1186–87 (Fla. 1977)." *Myers*, 592 F.3d at 1216 (citation spacing altered).

Florida "[t]rial courts retain broad discretion to limit financial worth discovery under the circumstances of each case and may consider the $100,000 cap that the legislature has placed on punitive damages under the FCRA." *Vital Pharms., Inc. v. Ohel*, 308 So. 3d 160, 164 (Fla. 4th DCA 2020).

## III. Rulings

### *A. Overview*

How did an age discrimination action between one plaintiff and one defendant, involving a relatively short time period, get to the point of eight lawyers, five motions to compel, and more than one thousand pages?

Counsel does not appear to share the goal of a "just, speedy, and inexpensive determination" of the action and appears undeterred by the threat of having to personally pay fees for any unreasonable multiplication of the proceedings. *See* Fed. R. Civ. P. 1 (quoted); 28 U.S.C. § 1927; *see, e.g.*, D27-6 (Forrest's 20-page, single-spaced letter to Shankman in an asserted attempt to confer); D27-2 (Almeida's fifty-eight requests for production); D37 at 21–23 (Shankman's request for a special master).

At least at times, counsel does not appear to have engaged in the civil and professional conduct expected of lawyers. *See* Local Rule 2.01(e); Middle District Discovery at Section I.A.1; *see, e.g.,* D27-5 at 5–6 (Shankman's and Forrest's email exchange); D45-5 at 29–42 (Shankman's, Forrest's, and Almeida's dispute during Svach's deposition); D64 at 46 (Shankman's and Forrest's dispute during the August 26, 2026, hearing).

Counsel appears to have spent insufficient time during the case management conference to identify the key witnesses, including Moninger, how they kept their documents, and when and how the documents would be produced. *See* Fed. R. Civ. P. 26(f); D13 (case management report).

Counsel has inundated the court with unredacted correspondence between the lawyers, despite the fact that such correspondence ordinarily should not be filed on the docket. *See* Middle District Discovery at Section I.C.1; *see, e.g.*, D34-1 to D34-5 (78 pages of mostly email exchanges filed by Forrest).

Allspring's counsel does not appear to have promptly conferred with Allspring employees and taken reasonable steps to ensure that Allspring "understands what documents are requested," "has adopted a reasonable plan to obtain documents in a timely and reasonable manner," and "is purposefully

implementing that plan in good faith." *See* Middle District Discovery at Section III.A.4 (quoted); *see, e.g.*, D45-5 at 24–25 (Svach's June 2026 testimony disclosing that he had not been asked to provide his notes about meetings and conversations with Crawley).

Allspring, first through Johnson and continuing through Forrest and Almeida, did not appropriately respond to Crawley's requests for production, including by failing to "reasonably and naturally interpret" the requests, *see* Middle District Discovery at Section III.A.3 (quoted); by failing to give words their "plain and ordinary meaning[,]" *see id.* at Section III.A.2 (quoted); by failing to clearly "state whether any responsive materials are being withheld on the basis of th[e] objection[s,]" *see* Fed. R. Civ. P. 34(b)(2)(C) (quoted); by appearing to make objections and imposing unreasonable limitations "solely to avoid producing documents that are relevant to" Crawley's claims, *see* Middle District Discovery at Section III.A.6 (quoted); by failing to provide the responses in a timely manner, *see* Fed. R. Civ. P. 34(b)(2)(A); and by failing to mark the documents to ensure that Crawley knew which ones responded to which requests, *see* Middle District Discovery at Section III.B.5. *See id.* at Section III.A.5; D29-3 (Allspring's original response).

Allspring, through Almeida and Forrest, should have paused Svach's deposition to allow him to look for his notes or allowed Shankman, at his option, to "adjourn the deposition until after such documents are produced[,]" and only Almeida—not Almeida and Forrest—should have been objecting during the deposition. *See* Middle District Discovery at Section II.A.2, II.C.2 (quoted); D45-5 at 29–42 (counsel's exchange during Svach's deposition).

Counsel does not appear to have consistently engaged in professional, substantive conversations about all discovery disputes, and Allspring's

counsel, at times, appears to have not responded "promptly to inquiries and communication from opposing counsel." *See* Middle District Discovery at Section I.A.2 (quoted); *see, e.g.*, D24 at 4–5.

That Allspring's lawyers have changed over time has not helped. *See* D8 (Holden's appearance as lead counsel); D15 (Johnson's appearance as lead counsel and Almeida's appearance); D19 (Johnson's withdrawal); D21 (Marchion's designation of lead counsel); D22 (Forrest's appearance); D23 (Holden's withdrawal); D60 (Darrow's appearance).

### *B. Crawley's First Motion to Compel*

At the hearing, the court **granted** Crawley's first motion to compel, D24, to the extent the court ordered Allspring to search Moninger's, Leonard's, and Heyliger's messages for documents concerning the decision to terminate Crawley (the court's intent was for Allspring to search email (all boxes), OneNote, Teams, and the like, including text messages, *see* D65 at 1 n.1) using the search terms "terminate," "separate," "reorganize," "rift," "reduction," "Crawley," and "Todd." D64 at 100–01.

Now, the court additionally **grants** Crawley's first and second motions to compel, D24, D37, to the extent that the court (1) strikes Allspring's objections to Crawley's requests for production, D29-2; (2) orders Allspring to produce the requested non-privileged, non-protected documents, subject to reconsideration for specific undue burden or expense (of which the court is unaware); and (3) orders Allspring to identify which documents are responsive to which requests for production. Allspring must "naturally interpret" the requests, *see* Middle District Discovery at Section III.A.3 (quoted); give the words their "plain and ordinary" meanings, *id.* at Section III.A.2 (quoted); and

use “reasonableness” and “common sense[,]” *id.* at Section III.B.1 (quoted), to provide responses that “fairly meet[] and compl[y] with the discovery request[s,]” *see id.* at Section I.C.4 (quoted). Considering the possible amount of ESI and the possible use of an ESI vendor, the parties may agree to modify the search. *See* D65 ¶¶8, 10.

By **September 22, 2026** (the date requested in the post-hearing motion, D65 ¶9), Forrest must file an affidavit or declaration under 28 U.S.C. § 1746 describing the discovery efforts. Considering the representations in the post-hearing motion, D65 ¶¶5, 6, Forrest need not file any of the documents produced.

The court declines to impose a fee sanction; in favor of Crawley because conferral efforts are unclear; in favor of Allspring because it unsuccessfully pressed its arguments. *See* Fed. R. Civ. P. 37(a)(5)(A)(i), (iii).

### *C. Allspring’s First Motion to Compel*

At the hearing, the court **denied** Allspring’s first motion to compel, D27, as to the disputes that had not already been resolved, *see* D62; D64 at 91–93. Crawley has provided discovery about any post-employment direct income. His wife’s income through trusts or otherwise, and his indirect income through investments or otherwise, have no relevance or so little relevance that discovery of the information would be disproportionate to the needs of the case. *See* Fed. R. Civ. P. 1, 26(b)(1).

### *D. Crawley’s Second Motion to Compel*

At the hearing, the court **granted** Crawley’s second motion to compel, D37, to the extent that he may resume Svach’s deposition without limitation,

except for the seven-hour limit. The deposition may occur on any day in September 2026 that the parties select. *See* D65 ¶9 (requesting September 29 or 30).

The court **denies** Crawley's second motion to compel, D37, to the extent that he wants to depose the remaining regional managers (Josh Fiedler, Christy Ryan, Tom Scherer, and Bob Warhol). Crawley could have taken more depositions during the discovery period, but he failed to arrange them, and now he cannot explain why he could not have done so had he acted diligently. *See* D14 ¶10; Fed. R. Civ. P. 16(b)(4); *Sosa*, 133 F.3d at 1418.

At the hearing, the court **denied** Crawley's second motion to compel, D37, to the extent Crawley asked to exclude Moninger as a witness. Almeida was at best careless in failing to disclose him on the April 2025 deadline to serve Allspring's mandatory initial disclosures and risked sanctions for falsely certifying, through her signature, that, to the best of her "knowledge, information, and belief formed after a reasonable inquiry … with respect to [the] disclosure, it [wa]s complete and correct as of the time it [was] made." *See* Fed. R. Civ. P. 26(g)(1)(A) (quoted); D47-2 (Allspring's mandatory initial disclosures identifying only Crawley, Svach, and Leonard). But the late disclosure was harmless because Allspring disclosed Moninger as the "[h]ighest level decision maker" in October 2025, D24-6 at 2; D47 at 3 n.2; Crawley deposed him as a corporate representative and fact witness in July 2026, D47 at 16; D64 at 14; Crawley had the opportunity to conduct discovery between the two dates; and Crawley can ask Svach more questions about Moninger's involvement during the remainder of Svach's deposition, *see* D45-5 at 9–10, 15, 18 (Svach's deposition testimony about Moninger). At one of the status conferences (two are now planned, including one today, D66), Crawley

may explain which discovery he needs but could not obtain, despite diligence, due to the late disclosure. D64 at 122–23.

At the hearing, the court **denied** Crawley's second motion to compel, D37, to the extent that he asks the court to appoint a special master. The discovery disputes can "be effectively and timely addressed" by the undersigned, including by requiring Forrest's affidavit or declaration. *See* Fed. R. Civ. P. 53(a)(1)(C) (quoted). Moreover, imposing the expense of a special master on either or both parties is unfair (the parties themselves do not appear to be the cause of any discovery dispute), and appointing a special master would result in "unreasonable expense or delay." *See* Fed. R. Civ. P. 53(a)(3) (quoted).

The court **denies** Crawley's and Allspring's respective requests for a fee sanction. D37 at 24; D47 at 19–20. Neither side won, neither side lost, and apportionment is unnecessary. *See* Fed. R. Civ. P. 37(a)(5)(C).

### *E. Crawley's and Allspring's Motions to Strike*

Crawley's motion to strike Allspring's "notice," D34 (notice); D35 at 7 (motion), and Allspring's motion to strike Crawley's response to the notice, D35 (response); D47 at 16 n.13 (motion), are **denied**. Neither the notice nor the response was necessary or warranted, but both are already on the docket, and striking either serves no apparent purpose.

### *F. Crawley's Oral Motions for Additional Discovery*

At the hearing, Shankman moved for discovery regarding Allspring's net worth, which is relevant to punitive damages, and the email folders Crawley kept on his subordinates, which are relevant to Crawley's performance. D64 at

85–87. The court **denies** the motions for failure to show that Crawley was unable to obtain the discovery during the discovery period despite diligence. *See* D14 ¶10; Fed. R. Civ. P. 16(b)(4); *Sosa*, 133 F.3d at 1418. Crawley can still use counsel's representation that Allspring's net worth is closer to $10 billion than $100,000, D64 at 96–97, subject to any sustained trial objection.

### *G. Allspring's Oral Motion to Extend a Deadline*

At the hearing, to account for the continuation of Svach's deposition, the court **granted** Allspring's motion to extend the dispositive motion deadline. D64 at 42–43, 100. The dispositive motion deadline is extended to **October 9, 2026**. All other deadlines and directives in the second amended case management and scheduling order, D30, remain in effect.

### *H. Status Conference*

In light of the additional time for Allspring to respond to Crawley's requests for production, the second telephone status conference is continued to **September 23, 2026**, at **9:00 a.m.** The parties may join the conference by calling (855) 244-8681 and entering access code 2315-242-8109.

## IV. Direction to the Clerk

Considering the notice of withdrawal, D62, the clerk is **directed** to **terminate** Allspring's third motion to compel, D42.

**Ordered** in Jacksonville, Florida, on September 3, 2026.

Patricia D. Barksdale
*United States Magistrate Judge*